Statement of the case.

### GEO. Y. METTS ET AL. v. STATE OF MISSISSIPPI.

1. TAX COLLECTOR.   *Bond.   Different terms.   Liability of sureties.*
   Where a tax collector who succeeds himself in office gives bond for each term with different sureties, and with the knowledge of the receiving officers, applies taxes collected during the second term to pay a default in the first, the state cannot recover of the sureties on the last bond the amount so applied.

2. SAME.   *Estoppel.*
   In such case where, some months after the term for which these sureties were bound, they first learned that the money had been so used, the mere fact that they did not then make objection to the misapplication, will not estop them when sued from showing that they are not liable for the amount.

FROM the circuit court of Winston county.

HON. A. G. MAYERS, Judge.

Metts was tax collector of Winston county for two terms. The first term was 1884 and 1885 ; the second was 1886 and 1887.  He gave a bond for each term, the sureties being different.  This suit is upon the last bond for an alleged failure to pay over taxes collected for the state during the last term.   The defense set up by the sureties was that the default did not occur during the term covered by the bond sued on, but that the tax collector had paid over the sums which he had collected during that term.   The general issue was also pleaded by the sureties.

Testimony was offered showing that Metts became a defaulter during the first year he was in office, 1884, and made up the deficit from the taxes collected the next year, so that when he entered upon the last term he was in default.   This he made good out of the taxes collected by him during that term.   Defendants, the sureties on this last bond, in June, 1888, after the expiration of the term of office in January, ascertained from the auditor's office the condition of the accounts of their principal, and found that he had taken the taxes collected during the last term of office to make good the default which had occurred in the first term, but they took no steps in the matter and made no objection at that time.   How-

ever, when this suit was brought in November, 1889, they set up the facts in defense as above stated.

On the trial, at the instance of the state, the court gave the following among other instructions :—

"2. Although the jury may believe from the evidence that a part of the funds collected in 1886 and 1887, was applied to the payment of taxes of 1885 to the state, yet if the jury further believe from the evidence that the defendants or either of them acting as agents for the others, knew these facts and acquiesced in them, and reported the same to the other defendants, and they acquiesced in it, then they cannot now avail themselves of a misapplication."

"4. If the jury believe from the evidence that there was a misapplication of the moneys collected out of the taxes of 1885 and 1887, and it was made by G. Y. Metts, at his instance or acquiescence, and not by the auditor or treasurer, then these defendants cannot avail themselves of the misapplication."

Plaintiff recovered judgment for the sum of $1434.75.    Motion for new trial being overruled, the sureties appealed.

The opinion contains a further statement of the case.

*Hamp Turner*, for appellants, filed a lengthy brief, and as to the questions decided by the court, made the following points :—

1. Metts was in default to the state during his first term.    The taxes collected by him during the last term were appropriated by the state officers to the discharge of this prior default, made long before appellants became liable for his acts.    This the law declares they could not do.    *Mann* v. *Yazoo City,* 31 Miss. 574 ; *United States* v. *January,* 7 Cranch, 572 ; *United States* v. *Giles,* 9 Ib. 212 ; *United States* v. *Irving,* 1 How. (U. S.) 250 ; *Jones* v. *United States,* 7 Ib. 688 ; 5 Peters, 378 ; 15 Ib. 187 ; Murfree on Official Bonds, 637.

The responsibility for the defalcation could not be shifted from one set of sureties by a mere sytem of book-keeping.    The officers could not do this, nor was it within the power of the legislature. Speaking of a question similar to this in the case of *United States*

v. *Irving, supra,* Justice McLean said : "The statement of the case is the best refutation of the argument. It is so unjust to the sureties and so directly in conflict with the law and its policy that it needs little consideration."

2. The court erred in granting the second instruction for the plaintiff. The state officials who received the moneys from the tax collector are agents or trustees for the state and these sureties, and they are bound to apply the money as the law directs. They could not enlarge the liability of the sureties. Their only obligation was that Metts would faithfully collect and faithfully pay over the taxes during the term of his office. Their obligation is strictly construed, and it was complied with. As to this, we refer to the authorities above cited.

3. The court erred in granting the fourth instruction for plaintiff. The collector does not misapply funds in his hands which he pays over to the officers. He simply makes a payment, and it is applied as the law directs. *United States* v. *Irving, supra.*

If the tax collector paid to the state officers what moneys arose during the time covered by the bond, however such payments may have been appropriated by the state officers, the sureties are discharged. Metts had no authority to dictate to the officers what they should do with the money, nor could he enlarge the liability of the sureties on his official bond. The law determines this liability, as if the officer had served but one term.

The decision from Virginia, relied on as authority by opposite counsel, is not in conflict with our position. That was a case of a *treasurer* whose duty was not to collect taxes on a certain assessment and for a certain time, as was required of Metts.

*Orr & Sims,* on the same side.

Metts testified distinctly that all the moneys collected for the years 1886 and 1887 he paid into the state treasury, and this was done with the knowledge of the auditor. The sheriff and the auditor could not slaughter the rights of the sureties by applying this money in payment of a defalcation in another term. The following authorities are conclusive on this point : Brandt on Suretyship, 468 ; *United States* v. *Irving,* 1 How. (U. S.) 250 ; 3 Abbot's

U. S. Digest, p. 643, and cases cited in paragraphs 96, 97, 98 and 99 ; 7 Cranch, 572 ; 17 Peters, 251.

*Calhoon & Green,* on the same side.

*T. M. Miller,* attorney-general, for appellee.

The testimony as to what the auditor is reported to have said to the bondsmen in 1888 was mere hearsay, and cannot be regarded. But if the testimony is competent, it only proves that the defendants were all notified of the application made by their principal, and they raised no objection to it until this suit was brought. If the application were unwarranted, when apprised of it, they should have made their objection so that the account could have been restated.

The case is this : In 1884 the collector is in default. The auditor does not know that he has embezzled the money. In 1885 he squares up this indebtedness, and again starts charged with the taxes of that year, which he pays at the end of 1886. *Prima facie* he had then the money of 1885 in hand. *Mann* v. *Yazoo City,* 31 Miss. 574. Again, at the end of 1887, he makes payment of the sum charged against him for 1886. In 1888 his last set of sureties claim that he embezzled the money collected during his first term. By the terms of the bond it was the duty of the collector to faithfully account for and pay over the money collected by him during his term, and there is no pretense that he did so. He accounted for and paid over the money as collector during the previous term. The money so paid in by the officer, for whose integrity these sureties vouched, has gone to satisfy, by his direction, an indebtedness covered by a previous bond. Money has no ear-marks. When a collector reports so much money as derived from the taxes of a particular year, and so pays it, the state's agents have no means of knowing the contrary and must accept the application as made. This is not the case of a running account between the treasurer and a collector. The latter is required to make reports and pay the money with them in accordance with a receipt warrant. If the right of the state to accept an application as made is denied on the theory that as to the tax moneys the col-

lector is a mere bailee and that the auditor and treasurer must be held acquainted with the subject of the bailment, all sorts of confusion would arise. It seems far more·appropriate to hold the sureties as vouchers for the good faith of their principal. Where there are different sets of sureties covering different periods of time the applications are to be made just as the collector may direct at the time of the payment, and such directions may be given expressly or by implication; but if debts are due by a collector or other receiver of money under bonds with different sets of sureties, and no application of payment is made by him, then the law will so apply the payments, if possible, as that money collected under one bond shall be applied to the relief of the sureties on that bond; and the auditor, *if informed of the source from which the money is derived*, cannot apply it otherwise even with the consent of the principal. Brandt on Suretyship, 294, citing *Chapman* v. *Commonwealth*, 25 Gratt. (Va.) 721; *Pickering* v. *Day*, 3 Houston, 474; *Stone* v. *Seymour*, 15 Wend. 19.

In *Crown* v. *Commonwealth* (Va.), 4 Southern Rep. 721, the facts were identically like those at bar, and it was held that the decision in *Chapman* v. *Commonwealth*, 25 Gratt., was conclusive. It was said "if the auditor had known that money applied by Scott to the payment of a debt for which his sureties, as collector, were not liable, was derived from the collection of revenue collected by him under the bond in which they were sureties, they might have just ground of complaint. But he had no such knowledge and the money had no ear-mark. The law is well settled that a man owing two debts to the same creditor may apply it to either of the debts as he pleases."

In *Lyndon* v. *Miller*, 36 Vt. 329, it was insisted that the sureties were discharged notwithstanding the application of the moneys collected to a prior account, but the court said that while it was the duty of the collector to have made the application of the money, his neglect to do so was the very ground of his liability and that of the sureties.

While the cases from the supreme court of the United States, and from Maine, Alabama and one or two other states to the con-

trary of this doctrine may seem to commend themselves to favor, I submit that the views of the courts referred to above are the most rational and practical.   It is always open for sureties for a successive term to ascertain the state of the would-be principal's account before they assume to vouch for his integrity and secure him the place.

Argued orally by *M. Green,* for appellants, and *T. M. Miller,* attorney-general, for appellee.

COOPER, J., delivered the opinion of the court.

The judgment in this case must be reversed for the error of the court in giving the second and fourth instructions for the state. The second instruction rests upon the fact that in June of the year 1888, many months after the term of office of Metts had expired, and, so far as the record discloses or suggests, long after all the controverted applications of payments, some of the sureties on Metts' official bond, acting for themselves and the other sureties, went to the auditor's office and there learned of the misappropriation of the collections by the sheriff by his appropriating them to a default on a previous term for which they were not bound.   This instruction, in effect, tells the jury that if the sureties then failed to object they are now precluded from defending on the ground of such misapplication.   It is not pretended that the sureties had any knowledge of the misapplications when made, or that they said or did anything from which their assent, at or before the time of such application, might have been implied.   The officers of the state did not act by reason of a supposed acquiescence by the sureties, nor was the state's condition at all changed in consequence thereof. There is, therefore, no ground for the application of the rule of estoppel.

By the fourth instruction the jury was told that if Metts misapplied the moneys collected by him in 1886 and 1887, by paying them over in discharge of a prior default, and that the misapplication was not made by the auditor and treasurer, then the sureties could not defend upon the ground of such misapplication.   It is unnecessary for us to decide in this case whether a misapplication

by the collector of the funds collected from the taxes of one year to the payment of a default of a prior year (a different set of sureties being liable for the different years), where such misapplication is unknown to the receiving officer, would render liable the sureties on the later bond, or whether the condition of the bond is kept wherever the money collected is actually paid into the treasury, regardless of its application by the collector or by the receiving officer. The authorities supporting both views are collected in the briefs of counsel for the state and for the appellants. It is sufficient for the decision of the present controversy to say that in no event could the sureties upon the later bond be held when the misapplication was made with the knowledge of the receiving officers at the time of the payment that the fund was being diverted from the course directed by law.

The complications presented by this case have manifestly arisen from a failure on the part of other officers than the delinquent collector to perform the duties devolved upon them by the provisions of law in relation to the collection of the public revenue. The system of our laws is so complete and efficient that, if properly enforced, conditions here shown to exist could never occur. By § 517 of the code, it is made the duty of each tax collector to " enter in a well-bound book, kept for the purpose, the date and number of each tax receipt issued by him, the name of the person paying the taxes, and the amount paid, which entry shall be made at the time of issuing the receipt, and the amount of the aggregate of such receipts, entered on one page, shall be shown and carried foward to the next page, and so on, so that the amount collected can be seen at any time by an inspection of such book. Each collector shall also enter in said book, in immediate connection with said other entries, the amount of his payment of taxes to the state and county treasurers, respectively, giving the date of such payment, so that it can be seen by reference to said book whether the payment made to the state and county treasurers embraced all he had collected, less his commissions." By § 518 it is made " the duty of each tax collector to present the book required by the last section to be kept by him to the board of supervisors when required ; and, upon final

settlement with the auditor of public accounts, said books shall be produced before him; and he shall indorse on it the fact, and the date of such presentation, and that he has examined the entries it contains of payment made to him of state taxes, and that such entries are correct." By § 548 of the code it is provided that "the collector shall pay over all taxes collected for the state or county to the state or county treasurer, within thirty days after the first day of October in any year, and monthly thereafter, and at each payment shall swear that the sum paid over in money or warrants is all that he has collected to that time; and his final settlement with the auditor and chancery clerk, respectively, shall be made by the first day of April with the former, and the first day of May with the latter, in the following year; and, if any collector shall fail to do so, he shall pay damages at the rate of thirty per centum per annum thereon, from the time the same shall be due until paid." Section 549 makes it the duty of the auditor, if any collector shall fail to pay into the state treasury the amount of taxes due the state within the time provided, to immediately notify the district attorney, and furnish him with a statement under his hand and seal of office of the amount due by such collector, and the district attorney is required forthwith to commence suit on the bond of the collector for the amount due. By § 554 it is provided that if any collector shall not report to the auditor and clerk of the chancery court and pay over to the state and county treasurers, within ten days after the 31st day of October, and of the last day of each month thereafter during the time of collecting taxes, he shall not only be punishable as provided by law, but the auditor, and clerk of the board of supervisors, after notice to such collector, and continued failure by him to report and pay over the taxes, shall report such failure to the governor, who may suspend such tax collector, and prohibit him from the performance of his functions as such, and may appoint some suitable person to collect such taxes.

These provisions of the code, if seasonably enforced, would put an end to embezzlement by tax collectors; for immediately upon the first default, the machinery of the law begins to move, the delinquent is removed from office, and the sureties on his official

bond are called upon to make good the deficiency. But, in the face of these simple and mandatory provisions of law, we find that on the 7th day of October, 1889, more than four years after the first default, and nearly two years after the expiration of the second term of office of the defaulting collector, the account here sued on was certified by the auditor, and on the trial of the cause the defaulting collector appears as a witness, and complacently explains to the court how for two successive terms he, a confessed and known defaulter, uninterruptedly pursued the even tenor of his way. We give the simple facts disclosed by the record, and place them in juxtaposition to the statutes applicable to them, to the end that similar occurrences may not again arise.

Our examination of the record suggests that in the trial at law it may be difficult to determine exactly when the default arose. In this condition of affairs it may be found advisable to proceed in equity, making the sureties on both bonds parties in order that the state may secure its debt against each set according as their respective liabilities may appear.

*The judgment is reversed, and cause remanded.*